Filed 2/24/26  P. v. Starr CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>REGGIE STARR,<br><br>    Defendant and Appellant. | B337884<br><br>(Los Angeles County<br>Super. Ct. No. YA097512) |

APPEAL from an order of the Superior Court of Los Angeles County, Kelly M. Kelley, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

Penal Code section 1001.36[1] grants trial courts discretion to permit certain defendants with "qualifying mental disorders" to participate in "pretrial diversion"—that is, " 'the postponement of prosecution, either temporarily or permanently, . . . to allow the defendant to undergo mental health treatment.' " (*People v. Frahs* (2020) 9 Cal.5th 618, 626 (*Frahs*), quoting § 1001.36, subd. (c).) Appellant Reggie Starr challenges an order denying his request for section 1001.36 diversion.[2] We affirm.

Substantial evidence supports the trial court's finding that Starr did not prove the symptoms of his mental disorders "would respond to mental health treatment." (§ 1001.36, subd. (c)(1).) Accordingly, Starr failed to make a prima facie showing he is "suitable for . . . diversion" (*id.*, subd. (c)), and the court did not abuse its discretion in denying Starr's request.

## FACTUAL BACKGROUND

### A.    Circumstances of Underlying Offenses

"Late in the evening of December 23, 2017, [victim] K.B. was at home watching a movie on TV with his minor son and a woman that K.B. had recently met. At around 1:00 a.m., the woman left, and Starr and an unidentified accomplice came in. K.B. had dozed off, but he woke up when he heard the sound of the men entering. Starr pointed a gun at K.B., demanded money, and asked where his safe was. Starr's accomplice took jewelry from K.B. and the son. Starr then led K.B. and his son into a

---

[1] All further statutory references are to the Penal Code.

[2] Because Starr sought relief under section 1001.36 only after a trial—specifically, following this court's conditional reversal of his convictions—we use the term "diversion" rather than "pretrial diversion."

2

bedroom while Starr's accomplice searched the premises and took additional valuables. [¶] After taking K.B.'s wallet and cell phone, Starr took K.B.'s car keys and ordered K.B. and the son to get into the back seat of K.B.'s car. Starr drove the car while his accomplice kept a gun pointed at K.B. and the son. (*People v. Starr* (Apr. 26, 2021, B304944) [nonpub. opn.] (*Starr*).) While Starr was driving, "two women in a different car pulled up next to [K.B.'s] car. The two women were later identified [as] [Starr's] girlfriend and [K.B.'s] houseguest." "Starr drove about a mile from K.B.'s home, and ordered K.B. and the son out of the car. Starr said, '[Y]ou better not call the police,' then drove away." (*Starr*, *supra*, B304944.)

### B.    Convictions and Conditional Reversal

On June 23, 2018, a jury convicted Starr of various offenses against K.B. and K.B.'s son. That same day, section 1001.36 became effective. (*Starr*, *supra*, B304944.) Starr appealed from the judgment of conviction, arguing, inter alia, that he should be allowed to request diversion.

This court agreed and conditionally reversed Starr's convictions for residential robbery (§ 211), kidnapping for carjacking (§ 209.5, subd. (a)), and dissuading a witness by force (§ 136.1, subd. (a)(1)),[3] "pending the outcome of a hearing regarding Starr's request for . . . diversion under . . . section 1001.36." (*Starr*, *supra*, B304944.)

---

[3] We also reversed, on other grounds, his convictions on two counts of kidnapping in violation of section 207, subdivision (a) and carjacking in violation of section 215, subdivision (a).

## C.    Diversion Hearing

Following remand, on April 16, 2024, the trial court held a hearing on Starr's request for section 1001.36 diversion, which respondent the People opposed.

### 1.    *Background:  Section 1001.36 Diversion*

Under section 1001.36, a defendant is "eligible" for diversion if (1) the defendant suffers from a qualifying mental disorder and (2) the disorder played a significant role in the commission of the charged offense.  (§ 1001.36, subd. (b)(1) & (2).)  If a defendant satisfies these eligibility requirements, the court may deem him or her "suitable" for diversion only if the defendant also establishes all of the following: (1) The defendant's "symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment" (§ 1001.36, subd. (c)(1)); (2) The defendant consents to diversion and waives his or her right to a speedy trial (§ 1001.36, subd. (c)(2)); (3) The defendant agrees to comply with treatment (§ 1001.36, subd. (c)(3)); and (4) The defendant "will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18"—meaning a risk that the defendant will commit one of several statutorily enumerated violent felonies known as " ' "super strikes" ' " (*People v. Moine* (2021) 62 Cal.App.5th 440, 449)—"if treated in the community" (§ 1001.36, subd. (c)(4)).

A hearing on suitability for diversion "shall be informal and may proceed on offers of proof, reliable hearsay, and argument of counsel."  (§ 1001.36, subd. (e).)  "The court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history,

the current charged offense, and any other factors that the court deems appropriate."  (§ 1001.36, subd. (c)(4).)

## 2. *Psychological Expert Report*

To establish his eligibility and suitability for diversion, Starr submitted a report of Dr. Lorraine E. Caudra, Ph.D., Chief Psychologist at the USC Institute of Psychiatry, Law, and Behavioral Science (the Caudra report).  Caudra based the report on her review of documents describing Starr's social, mental health, and criminal history, which she summarized in the report, as well as an approximately three-hour interview with Starr.  She concluded Starr met the diagnostic criteria for two mental health disorders to which section 1001.36 applies— post-traumatic stress disorder (PTSD) and bipolar disorder (see § 1001.36, subd. (b)(1))—and offered opinions on all section 1001.36 eligibility and suitability requirements.

### a. *Starr's social, mental health, and criminal history*

Starr spent a significant portion of his childhood in foster care.  His foster and family caregivers repeatedly abused and neglected him.  His school and child welfare services records reflect diagnoses for neurodevelopmental disorders, such as attention deficit and hyperactivity disorder (ADHD) and learning disabilities.  In school, he received special education and counseling services "to address his behavioral and academic performance problems."

Starr has an extensive juvenile criminal history.  At age 11, "on two separate occasions," authorities " 'counseled and released' " him on charges of battery.  At age 13, a court sustained petitions alleging false imprisonment and attempted

5

murder.  Based on a competency to stand trial evaluation, Starr spent a year in a "residential treatment program," rather than juvenile detention.  Mental health professionals supervising the program diagnosed him with bipolar disorder, PTSD, and ADHD. He often did not comply with program rules and requirements. Specifically, he "left the program without permission[,] engaged in drug use[,] left home without permission while on [a] home pass," and at times refused to take prescribed antidepressant and mood-stabilizing antipsychotic medication.

Once released from the program on probation, Starr declined to continue taking his prescribed psychiatric medication at all.  Between the ages of 14 and 17—so, beginning within months of his release from the residential treatment program— courts sustained multiple juvenile petitions against him.  As a result, he spent much of this time period in juvenile probation camps.

Starr was 19 at the time of his final release from a juvenile camp in March 2017.  In July 2017, a court convicted him of carrying a concealed dirk/dagger.  While still on probation from that conviction, Starr committed the offenses underlying his current request for diversion.

While in jail in 2019, county medical personnel diagnosed Starr with depression with psychotic features, PTSD, and stimulant use disorder.  They prescribed him antidepressant and mood-stabilizing antipsychotic medication.  Starr reported being medication compliant.

In March 2020, he was transferred to prison, where prison medical personnel again prescribed antidepressant and antipsychotic medication.  These prescriptions were still in place at the time Caudra evaluated him.  Prison records reflect Starr

6

sometimes does not take his prescribed medication. Starr told Caudra this is because he sometimes does not get up in time to take the medication.

In December 2020, Starr participated in a violent physical altercation with another prison inmate. He had not taken his medication that day. He told authorities that he did not remember the altercation, but that when he does not take his medication, "bad things happen." Prison medical personnel reported they could not establish a nexus between the incident and Starr's mental health conditions. In early 2021, Starr continued to display "aggressive" behavior in prison. As of October 2021, however, he was " 'engag[ing] in his mental health treatment' " and taking his medication.

### b. *Starr's June 2023 interview with Caudra*

Starr "vehemently" denied having committed the instant offenses, insisting—as he had at trial—that he was not in town when they occurred. According to Starr, on that day and for several months beforehand, he had not been taking his psychiatric medications and was using alcohol and drugs daily. He also had not slept for two days. Starr told Caudra he sometimes hears " 'voices telling [him] people are after [him]' " and to hurt others. Starr stated he was willing to comply with the requirements of diversion, because he knew the alternative is incarceration.

### c. *Conclusions and recommendations*

Caudra concluded Starr "continues to meet [the] diagnostic criteria" for PTSD, unspecified bipolar disorder, antisocial personality disorder and substance abuse disorder (currently

7

in remission due to his controlled environment in prison). He has a history of using cocaine, LSD, opioids, methamphetamine and ecstasy.

Caudra concluded that "other than his statement [that he slept] for several hours on the date of the instant offense, [Starr] did not report any other symptoms that would support or negate whether his mental health issues contributed to the commission of the instant offense," assuming, contrary to Starr's assertions, that he committed it.

Caudra concluded that, "[i]n general . . . [Starr's] mental health symptoms could respond to mental health treatment." "[H]is adherence to his psychiatric medication regimen" would address some of these symptoms. Without also addressing the effects of his childhood trauma, however, "he will still likely engage in problematic and impulsive behaviors." Thus, Starr would also need to participate in "evidence-based psychotherapeutic treatment[ ] . . . for people who have trauma-related problems."

Given Caudra's diagnosis of antisocial personality disorder and that Starr "has not shown a great deal of responsiveness to therapeutic interventions or legal sanctions[,] . . [o]verall, [his] response to treatment, should he actively participate in psychotherapeutic treatment, is expected to be slow, challenging, and with setbacks." Caudra further concluded: "[G]iven that [he] has a history of violating probation and not complying with treatment, it is questionable whether he would comply with the conditions of diversion."

Finally, Caudra identified "several factors that increase [Starr's] risk for reoffending if he is released into the community at this time" including "poor mental health treatment compliance

8

outside of a structured setting" and his "lack of response to therapeutic interventions and criminal sanctions." According to Caudra, "[i]n order to address his risk of danger to public safety," Starr would need a "[l]ong-term (at least one year) residential dual diagnosis treatment program with close supervision" (underscoring omitted) and a "highly structured daily schedule." Caudra did "not recommend[ ] that he be released into the community and be expected to successfully comply with any court-ordered conditions."

### 3.    *Court's Ruling*

The court concluded Starr had failed to make a prima facie showing of several section 1001.36 eligibility and suitability factors. First, Starr had not shown that symptoms of his qualifying mental health disorders were "a significant factor in the commission of the charged offense." Rather, Starr denied committing the offenses, and Caudra could not identify any symptom Starr reported experiencing around the time of the crimes that could have contributed to them. Second, Starr had not shown that the "symptoms motivating the criminal behavior would respond to mental health treatment, because again the court has no evidence before it that the defendant was experiencing any of those symptoms at or near the time he committed these crimes." Third, the court had "a concern with regard to . . . [Starr's] willingness to comply with the proposed treatment plan. Although he has articulated that he would comply, his history suggests otherwise," as Caudra likewise concluded. Finally, the court found that granting Starr's diversion request would pose an unreasonable risk of danger to public safety. Based on "an ongoing pattern of violent criminal history . . . as well as the facts of the current case and the

information contained in the [Caudra] report . . . with regard to his prospects for rehabilitation, . . . [Starr] is likely to commit a super strike offense." In this context, the court noted the current offenses involved "great violence and callousness" as well as "planning and sophistication." The court also expressed general "concern[ ] . . . that there is not an appropriate treatment plan that would suffice to rehabilitate [Starr] while simultaneously protect[ing] the public."

The court denied Starr's request for diversion. Starr timely appealed.

## DISCUSSION

Whether a defendant is eligible and suitable for diversion under section 1001.36 depends on the statutory requirements outlined above. (See Factual Background *ante*, part C.1.) If "the defendant makes a prima facie showing" that he or she meets all of these requirements, and "the trial court is satisfied that the recommended program of mental health treatment will meet the specialized mental health treatment needs of the defendant, then the court may grant . . . diversion." (*Frahs, supra,* 9 Cal.5th at p. 627; see also § 1001.36, subds. (a), (b)(3) & (c)(1).) We review a ruling on a section 1001.36 motion for abuse of discretion. (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147.) We review the factual underpinnings of that decision for substantial evidence. (*Ibid.*)

Section 1001.36's third suitability requirement—that the defendant's symptoms will respond to mental health treatment (§ 1001.36, subd. (c)(1))—is dispositive of the instant appeal. Substantial evidence—specifically, Starr's history of noncompliance with mental health treatment and court-ordered restrictions—supports the court's finding that the proposed

10

treatment plan will not effectively address Starr's symptoms. Accordingly, and as we explain further below, the court did not abuse its discretion in denying Starr's request for diversion.

The diversion statute does not require, as a prerequisite for suitability, an express finding that the defendant is likely to comply with the proposed mental health treatment. (See generally § 1001.36.) Subdivision (c)(3) requires only that "[t]he defendant *agree* to comply with treatment as a condition of diversion." (§ 1001.36, subd. (c)(3), italics added.) Other aspects of the statute, however, implicitly obligate the court to determine whether the defendant will likely follow through on this agreement. For example, and most relevant to the instant appeal, a court cannot determine whether the defendant's symptoms will "respond to mental health treatment" (§ 1001.36, subd. (c)(1)) without also assessing whether the defendant is likely to comply with aspects of the treatment that require such compliance to be effective.

Here, Caudra described Starr's compliance as integral to the efficacy of the contemplated treatment plan in multiple ways. The treatment plan includes regular psychiatric medication, and thus requires Starr to consistently take that medication. Caudra also deemed a highly-structured residential program the only safe means of effectively treating Starr for at least a year. This requires Starr to comply with the rules and restrictions of such a program over a sustained period of time. Finally, Caudra opined that Starr must participate in psychotherapy if his PTSD symptoms and antisocial behaviors are to improve.

Starr generally agreed to comply with treatment as a condition of diversion, including specifically taking his medication. But the court questioned whether Starr was likely

11

to actually do so, and substantial evidence supports the court's skepticism. Starr has a history of noncompliance with his psychiatric medications, absconding from a residential treatment program, and generally not following restrictions placed on him both in the community and while incarcerated. Indeed, he was on probation when he committed the offenses for which he now seeks diversion. Moreover, based on this "history of violating probation and not complying with treatment," Caudra concluded "it [was] questionable whether [Starr] would comply with the conditions of diversion."

Starr offers no evidence suggesting his past noncompliance is the result of any of his qualifying mental health disorders. And even if he had, section 1001.36 does not offer diversion to *all* who struggle with mental health disorders—only those who, inter alia, are willing and able to participate in treatment that may assist with these issues. (See § 1001.36, subds. (b), (c) & (f)(1)(A)(i); *Frahs*, *supra*, 9 Cal.5th at p. 627.) We have concluded substantial evidence supports the court's finding that Starr is not so able. We are cognizant that, in deciding whether a defendant meets the criteria for diversion, "the 'strong legislative preference for treatment of mental health disorders because of the benefits of such treatment to both the offending individual and the community' should inform a trial court's discretion." (*Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124, 138.) But that preference does not negate the statute's eligibility and suitability requirements. Thus, the court did not err in concluding Starr did not meet one of these requirements and was thus not a suitable candidate for diversion.

Moreover, even if Starr had met the eligibility and suitability requirements for diversion, "a court might [still]

12

reject diversion if it concluded that the proposed treatment services . . . could not effectively address [his] particular diagnosis." (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 895; see § 1001.36, subd. (f)(1)(A)(i) [diversion authorized by the statute requires that "[t]he court is satisfied that the recommended . . . program of mental health treatment will meet the specialized mental health treatment needs of the defendant"]; accord, *Frahs, supra*, 9 Cal.5th at p. 627.) Here, substantial evidence supports the court's implicit finding that the contemplated treatment plan, the efficacy of which depended on Starr's willingness to comply in ways he has historically struggled with, would not "meet [his] specialized mental health treatment needs." (§ 1001.36, subd. (f)(1)(A)(i).)

The court did not abuse its discretion in denying Starr's request for diversion.[4]

---

[4] We need not and do not address Starr's arguments regarding the court's analysis of section 1001.36 requirements other than the responsiveness of his symptoms to treatment under section 1001.36, subdivision (c)(1). If, as we conclude is the case, the court did not err in finding Starr does not meet this one requirement, we must affirm. (See generally § 1001.36, subds. (a) & (b); accord, *Frahs, supra*, 9 Cal.5th at p. 627.)

**DISPOSITION**

The order is affirmed.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

BENDIX, J.

WEINGART, J.

14